IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

LIBERTY HEALTH & REHAB OF
INDIANOLA, LLC                                                                    PLAINTIFF

VS.                                                              CAUSE NO. 2:12-cv-215-MPM-SAA

JOIE DORRIS PEACOCK HOWARTH, AS THE
SOLE WRONGFUL DEATH BENEFICIARY
OF GEORDIE DORRIS PEACOCK, DECEASED,
AND AS EXECUTRIX OF THE ESTATE OF
GEORDIE DORRIS PEACOCK, DECEASED                                    DEFENDANT

**ORDER**

On February 10, 2014, this court conducted a bench trial in the above-entitled action, and it is now prepared to render its final verdict. This is an arbitration case which plaintiff Liberty Health & Rehab of Indianola, LLC filed, under the Federal Arbitration Act, seeking to compel arbitration of a dispute which is presently being litigated in a wrongful death lawsuit in Mississippi state court. That underlying state court action involves claims arising out of the death of Geordie Peacock ("the decedent"), who, on July 26, 2011, was admitted as a resident at a nursing home operated by Liberty Health. That same day, the decedent signed an arbitration agreement which all parties agree, if valid and enforceable, bars the wrongful death action in state court. Defendant argues, however, that the arbitration agreement is not enforceable, since the decedent did not have mental capacity at the time he signed the agreement.

At trial, this court had two issues before it: 1) whether plaintiff had proven by a preponderance of the evidence that an agency relationship existed between the decedent and his live-in girlfriend Linda Stanfield (who also signed the arbitration agreement) and 2) whether defendant had proven that the decedent lacked mental capacity at the time he signed the

1

arbitration agreement. As discussed in the court's summary judgment order, the burden of proof is unclear with regard to the second issue, but it will assume for the sake of argument that, under Mississippi law, defendant must prove lack of capacity by clear and convincing evidence. With regard to the agency issue, this court entered a verdict at trial in favor of defendant, and, in so doing, it made findings of fact, which it reiterates here, that defendant had presented credible testimony from Ms. Stanfield that no agency relationship existed between herself and the decedent.

With regard to the competency issue, the court indicated in an order entered on January 12, 2014 (i.e., two days after trial) that it had concluded, based on the evidence at trial, that the decedent did not have the mental competency to enter into an arbitration agreement. The court concluded in that order, however, that it had improperly limited the trial testimony of defendant's expert, Nurse Susan P. Lofton, and that defendant should be given an opportunity to conduct a post-trial deposition of this witness so that this case would have a complete factual record for any appeal. The parties have now taken Nurse Lofton's deposition, and they have submitted a transcript of her testimony, along with plaintiff's objections to same. Having reviewed these submissions, the court finds that Nurse Lofton's views regarding Mr. Peacock's competency are similar to its own, but it reiterates once again that it has not relied primarily upon the post-litigation views of experts from either side in concluding that the decedent lacked competency to enter into an arbitration agreement.

In explaining its limited reliance upon the post-litigation testimony from experts for either side, this court wrote in its February 12, 2014 order as follows:

> This court never doubted that both sides would be able to find a paid or interested witness to offer an opinion that the decedent in this case either was or was not competent to sign an arbitration agreement. This court subjectively knew, however, that it would not base its eventual ruling primarily upon such after-the-fact expert testimony, even though, as

2

> explained in the order quoted above, it does place very considerable weight upon the contemporaneous medical reports prepared by Nurse Smith. For reasons which should be obvious, contemporaneous medical records prepared by experienced professionals with no contemplation of litigation are generally far more probative than after-the-fact opinions offered by paid or interested experts.

(February 12, 2014 order at 3-4).

In its pre-trial order denying summary judgment, this court similarly indicated that it viewed the contents of Nurse Joyce Smith's contemporaneous medical examination of the decedent to be the most important evidence in this case: Specifically, the court wrote as follows in its summary judgment order:

> At this juncture, this court is inclined to place considerably greater weight upon the contemporaneous medical records of Nurse Smith than upon paid or interested expert testimony from either side. Nurse Smith was plaintiff's own employee, and she was assigned the task of evaluating the decedent's mental state at the time of his admission to the nursing home. Presumably, plaintiff will not argue that it assigned this important responsibility to an employee who was not equal to the task. Just as important as Nurse Smith's credentials, in the court's view, is the fact that the objectivity of her contemporaneous records is not in any doubt. It is undisputed that Nurse Smith was simply performing a routine medical examination without any knowledge or consideration of how the results of that examination might be used in a future lawsuit. In arguing that the decedent was competent to sign an arbitration agreement, plaintiff relies upon the testimony of his treating physician Dr. Darrell Jee. However, this doctor's testimony is hardly objective, since he is presently a defendant in the civil lawsuit which plaintiff seeks to send to arbitration. This court will duly consider the paid or interested expert testimony from both sides, but, at this juncture, it is entitled to place greater weight upon the contemporaneous records and opinions formed by Nurse Smith, in evaluating the competency of the decedent.

(Summary judgment order at 11).

As the court anticipated, the records of Nurse Smith's mental examination of the decedent did prove to be the most significant and probative evidence at trial. Indeed, the court feels fortunate to have such evidence at its disposal, since signatories to important business documents usually are not subjected to mental examinations on the same day they sign the documents in question. The fact that such a contemporaneous mental examination was

conducted in this case made the court's task of determining competency to be much easier than if it had been asked to make findings based solely upon after-the-fact opinions of expert witnesses. As such, this court does not feel that it would be properly performing its duties as trier of fact if it did not place primary weight in this case upon the contemporaneous records of Nurse Smith's examination of the decedent.

All parties appear to agree that, under Mississippi law, the relevant test for mental competency is whether, at the time he signed the arbitration agreement, Mr. Peacock's "mind [was] so unsound, or [whether he was so] weak in mind, or so imbecile, no matter from what cause, that he [could not] manage the ordinary affairs of life." *Shippers Exp. v. Chapman*, 364 So. 2d 1097, 1100 (Miss. 1978). It must be acknowledged at the outset that there is some vagueness in the term "manage the ordinary affairs of life," and it can reasonably be questioned exactly what "affairs" the standard is talking about. Having reviewed Mississippi case law discussing this term, however, it seems reasonably clear that the "affairs" in question relate to the ability to make important personal, business and life decisions. In other words, the standard does not inquire as to whether the individual is able to brush his teeth, but rather looks to his capacity to make coherent decisions regarding important matters. For example, in determining that an individual who had been diagnosed with schizophrenia was able to manage his affairs, the Mississippi Court of Appeals found in a 1999 decision that he "[h]e was married, had children, managed his own money, hired an attorney to file three lawsuits and testified very coherently and competently at his discovery depositions." *Brumfield v. Lowe*, 744 So.2d 383, 387 (Miss. App. 1999).

In deciding whether the decedent in this case was able to "manage the ordinary affairs of life," the court finds most enlightening Nurse Smith's finding that he was unable, on the date he

signed the arbitration agreement, to state what year it was, within five years. The court views this fact to be one which is very difficult to "spin," and plaintiff has made little effort to do so. In the court's view, an inability to state what year it was, within five years, reflects a profound diminishment of mental capacity and a significant disconnect from reality. In her examination of the decedent, Nurse Smith also found that he was unable to recall simple words such as "sock," "blue" and "bed" mere minutes after they had been spoken to him, and she found that this inability persisted even after she gave him verbal hints. Clearly, this finding is further indicative of a very significant mental impairment on the part of Mr. Peacock.

In her testimony at trial, Nurse Smith expressed her view that the decedent could manage his affairs "with help," and plaintiff appears to suggest that the decedent had such help, in the form of his live-in girlfriend Ms. Stanfield. For the reasons stated previously, the court finds Nurse Smith's contemporaneous findings in her examination of the decedent to be far more probative than her post-litigation *opinions* regarding what is largely a legal, rather than a purely medical, standard. To the extent that Nurse Smith's post-litigation opinions are relevant, however, the court finds that neither Ms. Stanfield nor the nursing home's employees helped the decedent, in any meaningful way, to understand the terms of the arbitration agreement in this case. To the contrary, the testimony at trial described the decedent's signature of the arbitration agreement as being a largely *pro forma* affair, and there was no testimony regarding any special efforts which were made, by anyone, to assist Mr. Peacock in understanding the document he was signing.

In addition to the contemporaneous medical records, the court found Ms. Stanfield's trial testimony to strongly support a conclusion that the decedent lacked competency on the day he signed the arbitration agreement. Indeed, Ms. Stanfield testified that, in the months leading up to

5

his admission to the nursing home, Mr. Peacock repeatedly required her assistance in the simple act of writing a check. In the court's view, writing a check is one of the more rudimentary tasks which an individual faces in managing his affairs, and it is therefore significant that the decedent required assistance in performing this basic function. Moreover, the evidence at trial suggested that the decedent was in a rather rapid decline, both mental and physical, at the time he signed the arbitration agreement. Indeed, the decedent had suffered a serious fall at his home shortly before his admission to the nursing home, and the court notes that his signature on that agreement appeared much weaker than it did mere months previously.

Based on the evidence presented to it, the court has little difficulty in concluding that the defendant proved, by clear and convincing evidence, that Mr. Peacock lacked the competency to enter into an arbitration agreement in this case. The court is aware that nursing homes are often confronted with potential residents with diminished mental capacity, but it also true that such individuals are frequently the subjects of powers of attorney, medical conservatorships, or other such agency relationships. In this case, by contrast, plaintiff had the burden of proving that Ms. Stanfield served as the decedent's actual or apparent agent, and the sole testimony which it presented on that issue was the testimony of Stanfield herself, who made it very clear that she did not serve as agent for the decedent. Moreover, plaintiff presented no testimony that might allow the court to conclude that an apparent agency relationship existed in this case, and recent Mississippi case law is clearly unfavorable to it on this issue. *See, e.g. GGNSC Batesville, LLC v. Johnson*, 109 So.3d 562 (Miss. 2013).[1] The court therefore concludes that the proof at trial

---

[1] The court notes that it granted "directed verdict" on this issue, but it did so based on its evaluation, as trier of fact, of the content of the evidence at trial on this issue. Accordingly, referring to this court's ruling on this issue as being a "directed verdict" appears to be a misnomer, since there is no functional difference between the its ruling on the agency and

6

strongly supported defendant's positions on both the agency and competency issues, and the instant lawsuit seeking an order compelling arbitration of the underlying state court action is therefore due to be denied.

It is therefore ordered that defendant's complaint seeking an order compelling arbitration is denied.

A separate judgment will be entered this date, pursuant to Fed. R. Civ. P. 58.

SO ORDERED this 11th day of April, 2014.

                          **/s/ MICHAEL P. MILLS**
                          **CHIEF JUDGE**
                          **UNITED STATES DISTRICT COURT**
                          **NORTHERN DISTRICT OF MISSISSIPPI**

---

competency issues. As to both issues, the court is making findings of fact based upon the evidence presented at trial.